## IN THE UNITED STATES DISTRICT COURT
## OF KANSAS AT KANSAS CITY

SHAROL CARLSON                                                                    PLAINTIFF

VS.                                                          CAUSE NO. _____

MEDTRONIC MINIMED, INC.,
MINIMED DISTRIBUTION CORP.,
MEDTRONIC, INC., & MEDTRONIC USA,
INC.                                          DEFENDANTS

---

### COMPLAINT

### JURY TRIAL DEMANDED

---

COMES NOW the Plaintiff, Sharol Carlson, through undersigned counsel, and hereby files this Complaint against the Defendants, Medtronic MiniMed, Inc., MiniMed Distribution Corp., Medtronic, Inc., and Medtronic USA, Inc. (hereinafter sometimes collectively referred to as "Defendants" or "Medtronic"), and the Plaintiff states as follows:

### PARTIES

1.      Plaintiff, Sharol Carlson, is an adult resident citizen of Johnson County, Kansas. Her principal residence is located at 10917 W. 96th Place, Overland Park, Kansas.

2.      Defendant Medtronic MiniMed, Inc., is a foreign corporation organized and existing under the laws of Delaware, with its principal place of business at 18000 Devonshire Street, Northridge, California 91325.  At all times relevant this this Complaint, this Defendant conducted business in the State of Kansas, but does not maintain a registered agent for service of process in Kansas.  This Defendant may be served with process upon its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

3.      Defendant MiniMed Distribution Corp., is a foreign for-profit corporation organized and existing under the laws of Delaware, with its principal place of business at 18000 Devonshire Street, Northridge, California 91325.  At all times relevant this this Complaint, this Defendant conducted business in the State of Kansas.  This Defendant may be served with process via service upon its registered agent, Corporation Service Company, Inc., 2900 SW Wanamaker Driver, Suite 204, Topeka, Kansas 66614.

4.      Defendant Medtronic, Inc., is a foreign corporation organized and existing under the laws of Minnesota, with its principal place of business at 710 Medtronic Parkway, Minneapolis, Minnesota 55432.  At all times relevant this this Complaint, this Defendant conducted business in the State of Kansas.  This Defendant may be served with process via service upon its registered agent, Corporation Service Company, Inc., 2900 SW Wanamaker Driver, Suite 204, Topeka, Kansas 66614.

5.      Defendant Medtronic USA, Inc., is a foreign corporation organized and existing under the laws of Minnesota, with its principal place of business at 710 Medtronic Parkway, Minneapolis, Minnesota 55432.  At all times relevant this this Complaint, this Defendant conducted business in the State of Kansas.  This Defendant may be served with process via service upon its registered agent, Corporation Service Company, Inc., 2900 SW Wanamaker Driver, Suite 204, Topeka, Kansas 66614.

## JURISDICTION AND VENUE

6.       This Court has personal jurisdiction over Medtronic because Medtronic regularly conducts business in Kansas and has sufficient minimum contacts in Kansas. Medtronic intentionally availed itself of this jurisdiction by marketing and selling products and services and by accepting and processing payments for those products and services within Kansas. Defendant

further availed itself of jurisdiction in Kansas by designing, manufacturing, testing, packaging, marketing, distributing, labeling and/or placing said products in the stream of commerce with the knowledge that said products would reach Kansas.

7.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interests and costs, and this case is between citizens of different states.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this district and/or because Medtronic is subject to this Court's jurisdiction with respect to this action.

9.      The Plaintiff was injured as a result of the defective Medtronic products at issue in this Complaint.  The product failures and the proximately resulting injury occurred while she was in Kansas, within the jurisdiction of the United States District Court for the District of Kansas at Kansas City.  Jurisdiction and venue are appropriate in this Court.

## STATEMENT OF FACTS

10.      On or about August 26, 2017, Sharol Carlson was a healthy, 60 year-old resident of Kansas.

11.      Sharol Carlson is a diabetic, and at the time of subject incident she used a Medtronic insulin pump to deliver the necessary amount of insulin into her blood stream to properly treat her diabetes.  Said Medtronic insulin pump stored several days' worth of insulin. The insulin is delivered from the pump to the patient's body through plastic tubes called "infusion sets."

12.      Sharol Carlson used Medtronic MiniMed Quick-Set Infusion Sets to deliver the insulin from the pump to her body.

13.     On August 26, 2017, shortly after calculating her planned intake of carbohydrates, she inputted that information into her pump and insulin was delivered from the pump into her body and then finished dinner.  She became increasingly confused and rose to check her blood sugar.  Shortly thereafter, she blacked out and fell to the floor, resulting in severe and permanent injuries to Sharol Carlson.

14.     Pursuant to the EMS records from shortly after the crash, Sharol Carlson's blood sugar was 20, which is severely hypoglycemic.

15.     Sharol Carlson's low blood sugar and loss of consciousness, and subsequent black out/fall and injuries, were the direct result of the insulin pump dumping too much insulin into her blood stream, due to a defect with the infusion set as discussed below.  The defect, which ultimately resulted in a product recall, causes dangerous over-delivery of insulin shortly after an infusion set change, as occurred in the present case.

16.     As a result of the fall, Sharol Carlson suffered serious and permanent injuries. She suffered severe bi-lateral femur fractures, among other injuries.  Sharol was hospitalized for approximately 11 days and then admitted into rehab facilities for months, resulting in medical bills totaling several hundreds of thousands of dollars.

17.     The Medtronic MiniMed infusion set at issue malfunctioned as a result of a defect that caused fluid to block the infusion set membrane during the priming/fill-tubing process, which prevents the infusion set from working properly and results in over-delivery of insulin.

18.     The Medtronic MiniMed infusion set at issue was part of a lot of infusion sets that were subsequently recalled, nine days later, on September 7, 2017, due to the defective condition that injured Sharol Carlson.

4

## THE PRODUCT

19.     The Defendants designed, manufactured, marketed and distributed the MiniMed Quick-Set Infusion Sets, which are marketed to deliver insulin from an insulin pump to a diabetes patient in measured amounts. The MiniMed Quick-Set Infusion Sets consist of a membrane and disposable plastic tubes which transport insulin from the pump to the patient's body.

20.     The Medtronic MiniMed Infusion Sets are used in conjunction with an insulin pump to help diabetics regulate their blood sugar by providing a constant source of insulin. They provide an alternative to multiple daily injections of insulin. The pump, about the size of a deck of cards, weighs only a few ounces and can be worn on a belt or kept in a pouch under clothing. The pump connects to flexible plastic tubing that delivers insulin to the body. Users set the pump to give a steady trickle of insulin throughout the day.  It can be programmed to release larger doses at meals or at times when blood sugar is too high.

21.     Sharol Carlson had no way of knowing that the MiniMed Quick-Set Infusion Sets that she was using were defective in design, manufacture, and marketing, and that, even when used in conformance with Defendants' instructions, they were prone to deliver incorrect and life-threatening doses of insulin.

## THE COMPANY

22.     Medtronic is a global healthcare products company, with annual revenue in the billions of dollars.  Medtronic touts its leadership in the medical device industry, specifically representing that it has 25 years of continuous leadership in diabetes device solutions that improve patients' lives.  Medtronic claims to be passionate about diabetes care, with a highly trusted brand and a proven track record for advancing solutions.  This

claim is echoed in part of Medtronic's mission statement in which Medtronic vows to

"strive without reserve for the greatest possible reliability and quality in our products; to

be the unsurpassed standard of comparison and to be recognized as a company of

dedication, honesty, integrity, and service."

23.     In spite of Medtronic's stated mission, Medtronic MiniMed insulin pumps and

infusion sets have been the subject of a myriad of problems and defects over the years.  For

example, in sharp contrast to the virtuous ideals from Medtronic's Website are statements

from a June 1, 2009 letter from the United States Food and Drug Administration ("FDA")

to William A. Hawkins, Medtronic's president and chief executive officer regarding

Medtronic PR Operations Co., the firm where MiniMed insulin pumps are manufactured.

In criticizing Medtronic's manufacturing and reporting processes, the FDA  cited

Medtronic for:

> Failure to report to FDA no later than 30 calendar days after the day that
> you receive or otherwise become aware of information, from any source,
> that reasonably suggests that a device that you market: (1) may have caused
> or contributed to a death or serious injury; or (2) has malfunctioned and this
> device or a similar device that you market would be likely to cause or
> contribute to a death or serious injury, if the malfunction were to recur ...

24.     In contravention of applicable regulations, Medtronic had failed to report an

incident involving a MiniMed insulin pump in which "device failure or malfunction may

have contributed to or caused the user's hospitalization and the device's malfunction would

be likely to cause or contribute to a death or serious injury, if the malfunction were to

occur."

25.     The FDA also found fault with the personnel that Medtronic entrusted at its

manufacturing facility in Puerto Rico with determining whether a Medtronic device was

dangerous. Specifically, the FDA cited Medtronic for:

> Failure to have a person who is qualified to make a medical judgment reasonably conclude that a device did not cause or contribute to a death or serious injury, or that a malfunction would not be likely to cause or contribute to a death or serious injury if it were to recur, as required by [United States federal law]. Persons qualified to make a medical judgment include physicians, nurses, risk managers, and biomedical engineers, under [United States federal law].

26.     According to FDA Investigators, this plant had a wide range of problems that

included lax testing of products for defects, proper record keeping, and employing someone

with insufficient training as a medical expert to determine danger or defects.  Said employee

only had a high school diploma with some additional in-house training.  In listing these and

other violations, the FDA concluded that the problems may be symptomatic of serious

problems in Medtronic's manufacturing procedures and its quality controls.

27.   None of the cited violations reflect Medtronic's hollow promise to strive "without

reserve for the greatest possible reliability and quality in our products; to be the unsurpassed

standard of comparison and to be recognized as a company of dedication, honesty, integrity

and service."

28.     On or about June 29, 2009, these issues led to a Class 1 Recall of many of the

Defendants' insulin infusion sets labeled Paradigm Quick-Set Infusion Sets.  Said recall

included lots manufactured between 2007 and 2009.  Approximately three million disposable

infusion sets were recalled.

29.      On or about June 7, 2013, Medtronic MiniMed Paradigm infusions sets were

recalled via a Class 1 recall.  The recall was issued "because of a potential safety issue that

can occur if insulin or other fluids come in contact with the inside of the tubing connector.  If

this occurs it can temporarily block the vents that allow the pump to properly prime."

30.     The 2013 recall admitted that "[t]his can result in too much or too little being delivered resulting in hypoglycemia of hyperglycemia which can be severe and lead to serious illness."

31.     The 2013 recall was virtually identical to the 2017 recall at issue in this case. The same problems – fluid causing a vent blockage – resulting in the same outcomes – over-delivery of insulin – are at issue in both recalls.

32.     It is clear that Medtronic did not resolve the problem with their product that resulted in the 2013 recall.  Medtronic marketed the subject infusion sets without fixing the problem, and the subject infusion sets were ultimately subject to another recall for the same defect in 2017.

33.     Unfortunately, past recalls and problems associated with Medtronic infusion sets did not result in Medtronic designing and marketing safe products for use by Sharol Carlson.

## THE CURRENT RECALL

34.     On September 7, 2017, Medtronic issued an "Urgent Medical Device Recall" regarding Medctronic MiniMed Infusion Sets.

35.     The Recall Notice states that "Medtronic has become aware of recent reports of potential over-delivery of insulin shortly after an infusion set change."  Medtronic further notes that it has received reports of hypoglycemia requiring medical attention related to this issue, which Medtronic concedes can result in "hypoglycemia and in extreme cases, death."

36.     The Recall Notice states that this problem is caused by fluid blocking the infusion set membrane during the priming/fill-tubing process, which prevents the infusion set from working properly.  The result can be fast delivery of multiple days' worth of insulin.

37.     The Recall Notice also announces that Medtronic has an alternate infusion set design, which contains a "new and enhanced membrane material that significantly reduces the risk."

38.     Defendants were aware or should have been aware of the defects and risks associated with their products, but proceeded with conscious indifference to the rights, safety and welfare of others.  Over-delivery of insulin is a serious matter that poses catastrophic, lethal risks.

39.     As a result of the defective MiniMed Infusion Sets, Sharol Carlson received a large quantity of insulin, which resulted in extreme hypoglycemia and loss of consciousness. Causes of action are hereby asserted for the injuries and damages sustained by Sharol Carlson.

## CAUSES OF ACTION

### COUNT I
### PRODUCT LIABILITY

40.     The Plaintiff incorporates, adopts by reference and realleges each and every allegation of this Complaint the same as though specifically set out herein again.

41.     The Plaintiff hereby asserts a product liability claim pursuant to Section 60-3301of the Kansas Code, and other applicable Kansas law.

42.     At all times relevant to the Complaint, the Defendants were in the business of designing, manufacturing, marketing, testing, labeling, selling and distributing Medtronic MiniMed Infusion Sets.  The product at issue was defective and unreasonably dangerous at the time it left the hands of the Defendants.  Defendants placed their product into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design of the product.

43.     Defendants' product was unreasonably and dangerously defective beyond the

extent contemplated by ordinary users with ordinary knowledge regarding the product. Sharol

Carlson was unaware of the danger as Defendants provided ineffective and inadequate warnings

and instructions.

44.     Defendants' product was defective due to inadequate post-marketing warnings

and instructions, and/or inadequate testing and studies, and/or inadequate reporting regarding the

results.

45.     Defendants' product was defective in light of the dangers posed by its design and

the likelihood of those avoidable dangers. Defendants' product was defective because the

inherent risk of harm in Defendants' product design outweighed the utility or benefits of the

existing product design. Defendants' product was defective because reasonably cost-effective

and feasible state-of-the-art alternatives existed at the time that would not have undermined the

product's usefulness.

46.     Defendants were aware of effective substitutes for the product. The gravity and

likelihood of the dangers posed by the product's design outweighed the feasibility, cost, and

adverse consequences to the product's function of a safer alternative design that Defendants

reasonably should have adopted.

47.     There was a safer alternative design that would have prevented or significantly

reduced the risk of injury. It was reasonable as well as economically and technologically

feasible at the time the product left Defendants' control by the application of existing or

reasonably achievable scientific knowledge.

48.     The defective and unreasonably dangerous conditions discussed herein existed

when the product left Defendants' control. They existed when Defendants sold the product.

They existed when Sharol Carlson received it.

49.    At all relevant times, Defendants knew or reasonably should have known that their product was unreasonably dangerous and defective when used as designed and directed.

50.    Defendants held themselves out as experts and specialists and therefore possessed a higher degree of skill and learning.

51.    Defendants had a duty to exercise reasonable care, and to comply with the then existing standard of care, in the design, testing, research, development, packaging, distribution, promotion, marketing, advertising, instruction, and sale of their product. Specifically:

(a)    Defendants had a continuing duty to ensure that the product they provided was safe and used correctly through proper design, testing, research, adequate instruction, post-market surveillance, and appropriate modifications;

(b)    Defendants had a duty to anticipate the environment in which the product would be used and to design against the reasonably foreseeable risks attending the product's use in that setting, including misuse or alteration;

(c)    Defendants had a continuing duty to give an adequate warning of known or reasonably foreseeable dangers arising from the use of their product;

(d)    Defendants had a duty to provide adequate warnings and instructions, which means they had to be comprehensible to the average user, calculated to convey the material risks to the mind of a reasonably prudent person, and of an intensity commensurate with the danger involved;

(e)    Defendants had a continuing duty to assure the product they provided was properly labeled and true to the representations Defendants made about it;

(f)    Defendants had a continuing duty to make sure their product had complete and accurate information and instructions concerning its proper use;

11

(g)     Defendants had a continuing duty to modify their products, and their packaging, instructions, promotional and advertising efforts to eliminate confusion and user error, assure compliance, and prevent harm; and

(h)     Defendants had a continuing obligation to disseminate appropriate content and employ appropriate methods to convey accurate and complete product information.

52.     In violation of the existing standards and duties of care, Defendants, individually and collectively, deviated from reasonable and safe practices in the following ways, by:

(a)     designing a product defective in design and warnings/instructions;

(b)     failing to conduct pre and post market safety tests and studies;

(c)     failing to collect, analyze, and report available data regarding use of Defendants' product;

(d)     failing to conduct adequate post-market monitoring and surveillance;

(e)     failing to include adequate warnings about and/or instructions;

(f)     failing to provide adequate warnings and/or proper instructions regarding proper uses of the product;

(g)     failing to inform users that Defendants had not adequately tested or researched the product to determine its safety and risks;

(h)      failing to educate and instruct users about the unique characteristics of their product and the proper way to use it;

(i)     failing to implement and execute corrective and preventive actions to eliminate injuries; and

(j)     continuing to promote and market the product despite the foregoing failures. 53.

Had Defendants designed a safe product and/or undertaken the tests, studies, and steps described herein, the injuries and damages complained of here would not have occurred.

54.     The Defendants also breached express warranties.  The Defendants represented and warranted to Sharol Carlson that its Medtronic MiniMed Infusion Sets were safe for use in accordance with the Defendants' protocols.  Said representations were in the form of marketing materials, device information and product materials provided to Sharol Carlson.  Sharol Carlson justifiably relied on said representations and express warranties in electing to use said product.

55.     The Medtronic MiniMed Infusion Sets at issue did not conform to Defendants' express representations and warranties.

56.     At all relevant times, said product did not perform as safely as an ordinary consumer would expect when used as intended or in a reasonably foreseeable manner.

57.     At all relevant times, said product did not perform in accordance with the Defendants' representations.

58.     Defendants' product was not fit for the ordinary purpose for which such goods were used.  It was unmerchantable when used as directed and defective in design, and the Defendants' failure to provide adequate warnings and instructions also resulted in said product being unreasonably dangerous.  Defendants' product was dangerous to an extent beyond the expectations of ordinary consumers with common knowledge of the product's characteristics, including Sharol Carlson.

59.     The injuries and damages alleged herein were the reasonably foreseeable result of Defendants' product and conduct.

60.     Defendants are bound for the care of their agents, servants, employees, officers,

and directors and for the neglect and/or fraud of the same.  Defendants are liable for the conduct

of their agents, servants, employees, officers, and directors committed in the course of their

activities on behalf of and in furtherance of the company.  Defendants are liable for their agents,

employees, officers, and directors conduct attempting to advance Defendants' business.

Defendants expressly and impliedly authorized and ratified the conduct of their agents, servants,

employees, officers, and directors.  Defendants received significant benefits as a direct result of

their agents', employees', servants', officers', and directors' conduct.

      61.     Defendants' conduct showed willful, malice, wantonness, oppression, or that

entire want of care that raises the presumption of conscious indifference to consequences.

Defendants' wrongdoing constitutes gross negligence, and said gross negligence proximately

caused the injuries and damages sustained by Sharol Carlson.

## COMPENSATORY DAMAGES

      62.     Sharol Carlson suffered severe and permanent injuries and damages as a direct

and proximate result of the conduct and breaches of the Defendants, as aforesaid, for which

compensation is required.  Specifically, the Defendants' products caused Sharol Carlson to

sustain extreme hypoglycemia, resulting in loss of consciousness and the fall at issue.  The

Plaintiff is seeking monetary damages from the Defendants to compensate the Plaintiff for

damages arising from the defective Medtronic product, including all damages of any kind

allowed by Kansas law.

      63.     As a result of the aforementioned acts and/or omissions, the Defendants are liable

for all elements of damages including but not limited to:

      (a)     Damages for past doctor, hospital, drug, and medical bills;

      (b)     Damages for future doctor, hospital, drug, medical bills and life-care costs;

(c)     Damages for loss of wages and wage earning capacity;

(d)     Damages for disfigurement, impairment and disability;

(e)     Damages for past mental anguish and emotional distress;

(f)     Damages for physical pain and suffering;

(g)     Damages for loss of enjoyment of life;

(h)     Damages for all other losses, both economic and intrinsic, tangible and intangible, arising from the injuries as set out herein, all of which were proximately caused by the acts and/or omissions of the Defendants; and

(i)     Any other relief which the Court or jury deems just or appropriate based upon the circumstances.

64.     The Plaintiff reserves the right to prove the amount of damages at trial.  The amount of compensatory damages will be in an amount to be determined by the jury.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff, Sharol Carlson, sues and demands judgment from the Defendants, Medtronic MiniMed, Inc., MiniMed Distribution Corp., Medtronic, Inc., and Medtronic USA, Inc., and, and respectfully requests an order from this Court awarding damages and compensation for the following:

1.     An award of actual, consequential and incidental damages in such amounts as are sufficient to compensate in full the Plaintiff for the losses and damages actually incurred as a result of the Defendants' defective product and wrongdoing;

2.     An award of the Plaintiff's costs and expenses incurred in connection with this action, including attorneys' fees, expert witness fees and all other costs herein;

3.     An award of pre-judgment and post-judgment interest as the Court deems appropriate; and

4.      Granting such other and further relief as the Court deems just and proper,

including restitution, imposition of a constructive trust and/or such extraordinary

equitable or injunctive relief as permitted by law, equity or statutory provisions as

the Court deems proper to prevent unjust enrichment of the Defendants and to

provide the Plaintiff with an effective remedy for the damages caused and injuries

suffered as a result of the Defendants' wrongdoing as aforesaid.

**JURY TRIAL DEMANDED**

Respectfully submitted, this the 23rd day of August, 2019.


Respectfully submitted,

EDELMAN & THOMPSON, L.L.C.

*/s/ Brendan C. Buckley*
Brendan C. Buckley (KS Bar # 19416)
3100 Broadway, Suite 1400
Kansas City, Missouri 64111
(816) 561-3400 (Telephone)
(816) 561-1664 (Fax)
bbuckley@etkclaw.com (e-mail)

ATTORNEYS FOR PLAINTIFF